IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                       No. CR 07-00148 MV

VICTOR SANCHEZ,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the court on Defendant's Motion to Suppress Evidence with Supporting Authorities [Doc. 26]. Specifically, Defendant asks the court to suppress the evidence seized from Defendant's home on January 3, 2007, "to include but not limited to the marijuana found in Mr. Sanchez's garage which forms the basis of the Indictment filed in this case on January 24, 2007." Mot., p. 1. The court has considered the motion and the Government's Response to Defendant's Motion to Suppress Evidence [Doc. 36]. Additionally, the court conducted a hearing on this matter on November 18 and 19, 2008. After considering all of the evidence, argument and legal authorities concerning this matter, and being otherwise fully advised, the court finds the motion is not well-taken and should be **DENIED**.

## I. FACTUAL BACKGROUND

On June 9, 2005, Defendant was convicted in the State of New Mexico for possession of cocaine and conspiracy to commit possession of cocaine. Mot., Ex. B. He received consecutive sentences of 18 months imprisonment on each count, suspended to a 3-year term of probation. *Id.* On October 28, 2005, Defendant was sentenced to 12 months and one day imprisonment in the District of New Mexico for a probation violation. *See United States v. Sanchez*, No. 01 CR 1630 LH. He was released from federal custody on July 14, 2006, and placed on probation for

the state conviction.  Resp., p. 2.

In December of 2006, Defendant's Probation Officer, Leslie Daniels, requested assistance from the Probation Special Operations Unit in conducting a home visit (a.k.a. field visit) of Defendant's residence because she had been unable to conduct the visit herself; and because she had received a tip that Defendant may be living beyond his means.  Tr. 2[1] at 16, 18-20.  Officer Carl Cleland with the Special Operations Unit was assigned to conduct the home visit.  Before the visit, Officer Cleland met with Officer Daniels concerning Defendant.  Tr. at 56.  Officer Daniels advised him that Defendant had recently been released from federal prison and was on probation for a drug trafficking charge.  Tr. at 16.  She told him she had not been able to conduct the visit herself and had not been in Defendant's residence.  Tr. at 16, 54-55.  She further advised Officer Cleland that Defendant "had a history of bringing marijuana over the border and had a firearms charge."  Tr. at 16; *see also* Tr. 2 at 26.  Officer Daniels also told Officer Cleland that she had received information from another probation officer, Annette Keith, that Defendant "may be living above his means, that he had just moved into a new house, a big house, [and] that he had just recently purchased a new car."  Tr. at 16-17, 18; *see also* Tr. 2 at 25.  Additionally, Officer Daniels told Officer Cleland that Defendant "had previous ties with the Los Padillas gang."  Tr. at 18, 91-93; *see also* Tr. 2 at 26, 28.  Officer Cleland did not review Defendant's file or conditions of probation before conducting the home visit.  Tr. at 56, 58.

On January 3, 2007, at approximately 1:00 p.m., Officer Cleland and Officer Shawn Blas went to Defendant's home to conduct the home visit.  Tr. at 13.  The officers wore street clothes

---

[1]  The hearing on the motion to suppress was conducted on November 18 and 19, 2008. Therefore, citation to "Tr." denotes the transcript of the proceedings on November 18, 2008.  Citation to "Tr. 2" denotes the transcript of the proceedings on November 19, 2008.

and a vest with the words "probation and parole" on it and the "badge of office." Tr. at 13, 111.

The officers also wore a badge on a lanyard around their neck. Tr. at 13-14. The officers

knocked on the door and were greeted by Defendant's daughter, Ashley Lucero. Tr. at 19, 111.

The officers told Ashley who they are. Tr. at 19, 111. Ashley informed them her dad was not

home and was at work. Tr. at 19. Officer Cleland said he "explained to her that we were there

to conduct a home visit and asked if it was okay if she showed us around the residence because a

probation officer has not been able to find anybody home at the residence." Tr. at 19, 70-71; *see*

*also* Tr. at 111-12. Ashley agreed to show the officers around the house and let them in.[2] Tr. at

19, 71, 145. Ashley's 12-year-old brother was also home at the time. Tr. at 27, 110.

According to the officers, Ashley generally showed them the living room and kitchen and

then took them upstairs where the bedrooms were located.[3] Tr. at 19, 71. She pointed out her

room and then walked the officers down the hall to the master bedroom which belonged to her

mother and Defendant. Ashley, Officer Cleland and Officer Blas entered the bedroom. Tr. at

87-88. Officer Cleland immediately saw a red Philadelphia Phillies hat bearing the letter "P"

---

[2] Defense counsel attempts to create a discrepancy regarding the encounter at the door by prompting Ashley to testify that the officers did not specifically say: "[m]ay we come in and do a home search?" or use the word "consent" in their request to conduct a home visit. Tr. at 112. However, it is clear from all of the testimony on this issue that the officers told Ashley they wanted to conduct a home visit or field call and asked her if she would let them in and "show them around the house," which she did. Tr. at 19, 71, 111, 131, 145. At the hearing, each of the witnesses separately used the phrase "show them around" or "show us around" in describing the officers' request. *Id.* Therefore, the court finds that the officers did request consent to enter the house and conduct a home visit and that Ashley consented to the request.

[3] Ashley testified the officers did not request to see the living room and kitchen, but instead asked her to take them directly upstairs to Defendant's bedroom. Tr. at 113. However, the court finds the officers' version of the events in the house more plausible, and thus more credible, than Ashley's version. At the time of the home visit, the officers had no information that would lead them to believe contraband was in Defendant's bedroom, thus bypassing the need to see the rest of the house. On the contrary, the officers went to the home to conduct a home visit and take the first step of an investigation into whether Defendant was living beyond his means. Based upon that information, the officers would necessarily have wanted to see the entire house as part of a standard home visit and to investigate Defendant's living conditions.

sitting on top of the dresser.  Tr. at 19.  Officer Cleland testified that "through [his] training and experience that Los Padillas gang members, that's part of their attire.  They wear red, and with a 'P' because that stands for Padillas."  Tr. at 20.  Officer Cleland examined the hat and showed it to Officer Blas.  Tr. at 20.  He advised Officer Blas that the Phillies hat is "a hat that Los Padillas wears, possible gang attire."  Tr. at 20.  According to Ashley, Officer Cleland also asked her if she knew that "her dad wasn't supposed to have it."  Ashley responded "no."  Tr. at 114.

After looking at the hat, Officer Cleland turned towards the closet, which was open with Defendant's clothes plainly visible.  Tr. at 20.  He went over to the closet "to look to see if there was any other gang attire."  Tr. at 20.  Officer Cleland explained the reason he looked for more gang attire was because "probationers and parolees are not allowed to associate with anybody that is a detriment to their probation and parole which includes gang members."  Tr. at 20.  He further said "[p]art of probation and parole does not allow people to wear gang attire because that would be a detriment to their probation and parole."  Tr. at 20.  Upon looking in the closet, Officer Cleland immediately saw a black shirt hanging that bore a "yellow Zia symbol" and said the " 9th Annual Boyz Party."  Tr. at 20-21, 61.   On the front of the shirt it said "Padillas."  Tr. at 21.  Through his training and experience, Officer Cleland immediately recognized the shirt as referring to an annual party sponsored by the Los Padillas gang.  Officer Cleland further testified that the placement of the shirt in the closet was such that he did not have to move it to see the Zia symbol, which is also associated with Los Padillas gang attire.  Tr. at 22, 89-90.  He opined that "there was either a space there, or it was the last shirt or something but you did not have to move the shirt to see the Zia symbol."  Tr. at 22.  Once he saw the shirt, he removed it to show Officer Blas.  Tr. at 22.

Believing the gang attire gave him reasonable suspicion of a probation violation, Officer Cleland began a search of the closet for other gang attire.  Specifically, he looked in a laundry hamper directly below the hanging clothes in the closet.  He "moved some clothes on that [the hamper] to see if there was any other gang clothing."  Tr. at 22.  He said "[a]t that point, I was looking for anything that says Los Padillas, the Boyz, with their symbol on it or anything."  Tr. at 22-23, 72.  After removing the clothes on top of the hamper, he saw a plastic bag containing a large amount of money.  Tr. at 23-24, 72.  He picked up the bag, realized it was fairly heavy and contained "a lot of money" and then dropped it back down in the hamper.  Tr. at 24.  He then exited the closet.  Tr. at 24, 62.

At that point, according to Officer Cleland, Ashley asked if she could call her mother, Julie Sanchez, which he allowed.[4]  Tr. at 24, 73; *see also* Tr. at 146-47.  After she called Ms. Sanchez, Ashley handed the phone to Officer Cleland.  Tr. at 24; *see also* Tr. at 147.  He "explained to her [Ms. Sanchez] what [they] were doing, that [they] were doing a home visit and [Officer Cleland] explained that [he] found Los Padillas clothing."  Tr. at 24.  Officer Cleland said he told Ms. Sanchez that he had seen a Los Padillas hat and shirt which Defendant was not allowed to have.  Ms. Sanchez responded "she didn't realize that he still had those items."  Tr. at 24.  Ms. Sanchez then asked "if she needed to come home."  Tr. at 24.  Officer Cleland responded that they "were just doing a home visit" and "told her we were leaving."  Tr. at 24.  He then handed the phone back to Ashley and walked out of the house.  Tr. at 24, 73.

---

[4] Ashley denies calling her mother.  Tr. at 120, 132-33.  However, the court finds the officers' statements that she made the call more credible based upon: 1) the fact that the officers have no motive to fabricate the call because it does not affect the validity of their conduct; 2) Officer Cleland's subsequent behavior and fear for his safety, which was consistent with his belief that Ms. Sanchez knew they were at the house; and 3) Ashley's general lack of credibility arising from her numerous implausible statements.

After finding such a large sum of money, Officer Cleland said he and Officer Blas left the residence because they were "in fear for [their] lives."[5]  Tr. at 37; *see also* Tr. at 147.  He said once he saw the money, he believed "there was drug-trafficking going on" and did not know if phone calls were being made or if someone might show up at the residence who might be violent in light of Defendant's history and gang ties.  Tr. at 37.  Therefore, Officer Cleland and Officer Blas "went down the road to call for backup right away and [they] sat and watched the residence while the backup came."  Tr. at 37.  They waited approximately 15 to 20 minutes, during which time they saw a white truck pull up to the residence and a male approach the front door.  Tr. at 37; *see also* Tr. at 148.  Officer Cleland said they "immediately thought that they were sending somebody to move the money and that if we didn't go back to the residence at that point, it would be gone."  Tr. at 37.  The officers approached the man at the door, later identified as a relative, Robert Sanchez, and informed Ashley that they "had seen something in the bedroom and . . . needed to reenter the house."  Tr. at 37, 40.

Upon entering the house, the officers asked Ashley, her brother and Robert to sit on the couch in the living room.  Officer Cleland took their cell phones from them so that they could not call anyone while they were waiting for backup.  Tr. at 40, 74.  Officer Blas stayed in the living room with them while Officer Cleland went back up to the bedroom to confirm what he saw in the laundry hamper.  Tr. at 37, 96.  After examining the plastic bag of money again, Officer Cleland went back downstairs and called for a marked police unit, which arrived about five to ten minutes later.  Tr. at 38, 97.  Officer Cleland asked the marked unit to "park down the

---

[5] Ashley denies the officers left the house.  Tr. at 116.  Again, the court accepts the officers' testimony as true for the reasons stated previously as well as the fact that the officers testified about events occurring outside the house that support their contention that they left the home.

street a little ways out of sight and watch the residence." Tr. at 38. At the same time, two other

probation officers, Mike Baca and Esteban Sepulveda, arrived. Tr. at 38.

Officer Sepulveda stayed in the house with Officer Cleland, while Officer Blas and

Officer Baca got back in their vehicles and parked down the street to watch the residence and

advise Officer Cleland if anyone else came to the house. Tr. at 38. A short time later, narcotics

officers arrived at the house in response to Officer Cleland's first call for assistance. Tr. at 38,

75. The narcotics officers entered the house. Officer Cleland took them to the bedroom and

showed them the bag of money in the hamper. This time, he also saw a second bag of money in

the hamper. It was subsequently determined that these bags, and two smaller quantities of cash

found in the bedroom amounted to approximately $111,000 in cash. Mot., p. 3. Officer Cleland

told the narcotics officers that he thought the DEA (Drug Enforcement Administration) should

be involved. The narcotics officer agreed and contacted their office. Tr. at 39.

Once the other officers arrived, Officer Cleland "continued with the probation search."

Tr. at 40. He went downstairs and walked into the garage. According to Officer Cleland, upon

entering the garage, he could immediately smell marijuana. Tr. at 53. Furthermore, as he

walked into the garage he:

> . . . could see a bag laying open. It was like a Wal-Mart bag or something, a
> plastic bag laying open, and there was a brick of marijuana that had been torn
> apart a little bit, and there was actually some marijuana on the floor of the garage.
>
> There were four boxes of like moving boxes in the corner of the garage.
> As you walked to the boxes, the top box was opened and you look in it, there
> were also packages which I know through my training and experience that I
> believed to be packaged narcotics.

Tr. at 40. Later, it was determined that the boxes in the garage contained over 100 gross

kilograms of marijuana. Tr. at 53; *see* Indictment [Doc. 3]. Officer Cleland then showed the

7

narcotics detective what he found in the garage and turned the matter over to the Albuquerque

Police Department ("APD") for further investigation.  Tr. at 41, 76-77.  At that point, APD

obtained a warrant to search the residence.  Tr. at 41, 77.

## II. LEGAL ANALYSIS

A probationer does not have the same constitutional rights afforded other citizens.  *See*

*United States v. Trujillo*, 404 F.3d 1238, 1242 (10th Cir. 2005) ("probationers and parolees do not

enjoy the full suite of rights provided under the Fourth Amendment").  A probationer's right to

privacy is significantly diminished.  *See United States v. Knights*, 534 U.S. 112, 120-22, 122

S.Ct. 587, 151 L.Ed.2d 497 (2001).  Probationers are subject to government scrutiny and routine

searches of their home as a condition of their probation.  *Id.*  The Supreme Court explained "the

restrictions placed on probationers serve the twin goals of effective rehabilitation and insulating

communities from the potential harm created by recidivism."  *Trujillo*, 404 F.3d at 1242 (citing

*Griffin v. Wisconsin*, 483 U.S. 868, 875, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987)).  The law

assumes probationers are more likely than other citizens to commit crimes and have a greater

incentive to conceal criminal activity and dispose of incriminating evidence because they do not

have the same rights as ordinary criminals.  *Knights*, 534 U.S. at 120 (citations omitted).

Therefore, the Supreme Court has determined that "[w]hen an officer has reasonable

suspicion that a probationer subject to a search condition is engaged in criminal activity, there is

enough likelihood that criminal conduct is occurring that an intrusion on the probationer's

significantly diminished privacy interests is reasonable."  *Id.* at 121.  The Supreme Court further

stated that "[t]he same circumstances that lead us to conclude that reasonable suspicion is

constitutionally sufficient also render a warrant requirement unnecessary."  *Id.* (citing *Illinois v.*

*McArthur*, 531 U.S. 326, 330, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001); *see also Griffin*, 483 U.S. at 880.

In this case, Defendant's Order of Probation includes a search condition, which states:

> 6-Visits:  I will permit any Probation/Parole Officer to visit me at my home or place of employment at any time.  I will permit a warrant-less search by the Officer of my person, automobile, residence, property and/or living quarters if he/she has *reasonable cause to believe the search will produce evidence of a violation of my conditions of probation.*

Def. Ex. A (emphasis added).  Defendant signed the order and initialed each condition separately acknowledging that he read, understood and agreed to abide by the conditions.  *Id.*  Therefore, according to the search condition, an officer only needs reasonable suspicion of a probation violation, not necessarily a crime, to conduct a warrantless probation search.  *See United States v. Crew*, 345 F.Supp.2d 1264, 1268 (D. Utah 2004) ("The 'reasonable suspicion' standard is triggered by suspicions of violations of the conditions of parole.  Thus, there does not also have to be a reasonable suspicion of a violation of the law."); *see also State v. Baca*, 90 P.3d 509, 513 (N.M. Ct. App. 2004) (finding constitutional a virtually identical New Mexico search condition).

### A.    Home Visit

Home visits are less pervasive than probation searches.  A probation officer can conduct a home visit at any time with whatever frequency deemed appropriate for the individual probationer by his or her probation officer.  Home visits are standard conditions of probation.  In this case, Defendant consented to home visits "at any time."  Def. Ex. A, ¶ 6.  Furthermore, he reviewed and signed the Rules for Home Visits.  Gov. Ex. 2.  A home visit is not considered a search implicating the Fourth Amendment.  "There is a 'common sense' distinction between visits and searches: searches are 'an intrusive, probing endeavor,' while home visits are 'much

9

more restricted in scope.'"  *United States v. Newton*, 181 F.Supp.2d 157, 161 (E.D.N.Y. 2002)

(quoting *Diaz v. Ward*, 506 F. Supp. 226, 228 (S.D.N.Y. 1980)).  Although a home visit is not a

search, it "may result in seizure of contraband in plain view."  *Id.*, 181 F.Supp.2d at 161 (citation

omitted).

Officer Cleland and Officer Daniels testified about the permissible scope of a probation

home visit.  Officer Cleland explained:

> A home visit is probation and parole officers have to visit people that are on
> probation and parole at their homes.  There's a certain amount of times you have
> to visit, whether it be once a month, twice a month, three times a month, and it's
> up to the probation officer if they want to visit more often.
>
> What the visit is, is to determine first of all that the person lives where they say
> they live and that they are abiding by their conditions of probation and parole.  In
> other words, you go to the house, you just kind of walk through the house, talk to
> them, or whoever lives at the house, make sure they're doing okay, ask whoever
> is living there if they are doing fine if there have been any problems.  Just kind of
> make sure that everything is in order.

Tr. at 15.  Officer Daniels described the extent of the home visit as just looking around to see if

they are in compliance with their conditions of probation.  Tr. 2 at 43.  For example, she said an

officer may look in the refrigerator for alcohol because probationers are not allowed to have

alcohol.  Tr. 2 at 43.  She further said: "[i]f we want to see something, typically we'll ask them to

show us like: Can we open the closet?  And we will look in."  Tr. 2 at 44.  According to Officer

Daniels, probation officers "do not go in without people's consent and just open drawers and

open closets and look under beds."  Tr. 2 at 46.  During a home visit, probation officers "ask

permission to do all that."  Tr. 2 at 46.

## B.    Consent to Conduct Home Visit

Pursuant to the Order of Probation, Defendant is obligated to permit any probation officer

10

to visit him at his home at any time, and to conduct a search of his residence if the officer has "reasonable cause to believe the search will produce evidence of a violation" of Defendant's conditions of probation.  Def. Ex. A, ¶ 6.  Furthermore, according to the Rules for Home Visits, Defendant agreed to "advise all members of my household that Probation & Parole Officers will occasionally visit the residence and ask them to show courtesy and respect toward the Officers." Gov. Ex. 2, ¶ 1.  Neither the Order of Probation nor the Rules for Home Visits requires Defendant's household members to give probation officers access to Defendant's home in his absence.  *See* Def. Ex. A, Gov. Ex. 2.  Therefore, while Defendant is obligated to allow probation officers to enter his home, valid consent must be obtained by the probation officer to enter when Defendant is not there.

The court first considers the validity of Ashley's consent to allow Officer Cleland and Officer Blas to conduct a home visit.  In order for consent to be valid, it must be given freely and voluntarily by someone with actual or apparent authority.  *See United States v. Cos*, 498 F.3d 1115, 1124 (10th Cir. 2007) (discussing actual and apparent authority); *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (discussing voluntariness).  Voluntariness is a question of fact determined from the totality of the circumstances; while actual or apparent authority is a legal question.  *See Cos*, 498 F.3d at 1120 (citing *United States v. Trotter*, 483 F.3d 694, 698 (10th Cir. 2007)); *Pena*, 143 F.3d at 1366.  The age of the person at issue is a factor relevant to the determination of both voluntariness and actual or apparent authority.  *See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1230-31 (10th Cir. 1998).  The government bears the burden of establishing the validity of Ashley's consent to conduct a home visit.  *See Cos*, 498 F.3d at 1124; *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999).

11

1.        **Voluntariness**

The Tenth Circuit developed a two-step test for determining the voluntariness of a consent to search:  the government must  1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and 2) "prove that this consent was given without implied or express duress or coercion."  *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995) (citation omitted).  Ashley's status as a 15-year-old minor at the time of the home visit does not negate her capacity to consent to it.  *See Gutierrez-Hermosillo*, 142 F.3d at 1230-31.  Age is just one of the many factors bearing upon voluntariness, which may affect her intelligence and vulnerability to coercion.  *See id.* at 1230 (citing *Lenz v. Winburn*, 51 F.3d 1540, 1548-49 (11th Cir. 1995)).

In this case, the court finds Ashley freely and unequivocally consented to the officers' entry into the house to conduct a home visit.  The testimony clearly shows the officers identified themselves, advised Ashley that they had come to conduct a home visit and asked her if she would "show them around" the house.  Tr. at 19, 70-71, 111-12, 131, 145.  It is undisputed that Ashley agreed to "show them around" and then allowed them to enter the house.  Tr. at 131.  The fact that Ashley then gave the officers a tour of the house supports the finding that she consented to the home visit.  *See* Tr. at 19, 131.  Furthermore, Ashley was aware of her father's status as a probationer and his condition allowing for home visits by probation officers.  Tr. at 134-35.  Therefore, the visit was not a surprise to her and she had knowledge of its purpose.  Tr. at 25.  Her assertion that she "thought they had authority to both come in," Tr. at 112, does not undermine her consent.  "[L]egal sophistication is not required for adults to give valid consent" and therefore it is not required for minors.  *Gutierrez-Hermosillo*, 142 F.3d at 1230 (citing *Lenz*,

*supra*).

The court also finds Ashley was a mature 15-year-old girl capable of freely and intelligently giving consent to conduct a home visit.  Ashley was clearly in charge of the house while her parents were at work and was responsible for taking care of her younger brother.  Tr. 125-26.  Additionally, there were empty alcohol bottles and posters of marijuana on the walls in plain view in Ashley's bedroom.  Tr. at 48-50, 121-22.  A small quantity of marijuana was later discovered in her room which she said was not from her father but was her "own personal use."[6] Tr. at 122.  Ashley's testimony also revealed that she became pregnant only a few months after the home visit.  Tr. at 134.  These facts are indicative of mature behavior, not a young naive child.

Additionally, the visit took place during the day at approximately 1:00 p.m. Tr. at 13. The officers were dressed in street clothes with a vest and lanyard identifying them as probation officers.  Tr. at 13, 111, 144-45.  Officer Cleland's gun was not visible to Ashley.  Tr. at 14, 111, 130.  The officers' overall appearance and demeanor was courteous and non-threatening.  The encounter between Ashley and the officers was polite and cooperative.  Tr. at 25-26, 135.  The officers did not demand entry into the home or otherwise indicate they had authority to enter without Ashley's consent.  There is also no evidence that the officers took advantage of Ashley's youth by asking to see more of the home than is standard for a home visit.  On the contrary, the

---

[6] Ashley denied drinking alcohol and said only "collected" the bottles.  Tr. at 121-22.  Referring to the marijuana found in her room, she claimed her "parents had no idea that [she] ever smoked that."  Tr. at 122.  These statements bear on the court's determination of Ashley's credibility.  The court finds it unlikely that an experienced teenager like Ashley only "collected" alcohol bottles.  More implausible is her assertion that her parents did not know she smoked marijuana when there were three large posters depicting marijuana visibly displayed in her room and over 100 kilograms of marijuana readily available to her in the garage.

officers allowed Ashley to guide them through the house pointing out the various rooms. Tr. at 19. Therefore, the court finds Ashley freely and voluntarily consented to the home visit without the influence of duress or coercion.

### 2.    Actual Authority

In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court determined that a "third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" has actual authority to consent to a search. The Tenth Circuit has interpreted *Matlock* as establishing the following standards for assessing actual authority to consent to a search of a residence: 1) mutual use of the property by virtue of joint access, or 2) control for most purposes over it. *See Rith*, 164 F.3d at 1329. Furthermore, a minor child can give consent to search her residence when the minor otherwise satisfies the *Matlock* test. *See United States v. Guitierrez-Hermosillo*, 142 F.3d 1225, 1230-31 (10th Cir. 1998) (following Sixth and Eleventh Circuits and finding 14-year-old girl had authority to consent to search of motel room); *United States v. Clutter*, 914 F.2d 775 (6th Cir. 1990) (12 and 14-year-old boys had actual authority to consent to search of their mother's bedroom).

In this case, the evidence shows Ashley had both mutual use of the property and control for most purposes over it. Ashley lived in the house with her parents and siblings. Tr. at 125, 127. She admitted she was often left home alone to take care of her younger brother while her parents were at work. Tr. at 126. She admitted she was "in charge" of the home at the time of the visit and had "no restrictions on [her] behavior in the home at all." Tr. at 125. She had "access to the entire house." Tr. at 129. Furthermore, there were no separate locks on her

14

parents' bedroom, her parents' closet or the garage indicating she did not have use of those parts

of the property.  Tr. at 128-29; *see also Rith*, 164 F.3d at 1331 (locks on doors may rebut

presumption of control).  Therefore, Ashley clearly had mutual use of the property by virtue of

joint access to the entire house.  *See id.* at 1329-30.  Furthermore, the parent-child relationship

between Defendant and Ashley gives rise to the presumption that Ashley had control over the

property.  *Cos*, 498 F.3d at 1125.  There is no evidence to rebut this presumption.  Consequently,

the court finds Ashley had actual authority to consent to the home visit.

### 3.    Apparent Authority

A third party with apparent authority may also give valid consent to a search.  Apparent

authority exists when an officer reasonably, but erroneously, believes the third party has actual

authority to consent.  *See Illinois v. Rodriguez*, 497 U.S. 177, 186-88, 110 S.Ct. 2793, 111

L.Ed.2d 148 (1990); *Cos*, 498 F.3d at 1128.  The determination of the reasonableness of the

officer's belief is objective.  *Cos*, 498 F.3d at 1128.  "Whether, as a matter of law, a minor could

consent to the entry is a factor to consider in deciding the reasonableness of the officers' belief

that their entry was authorized."  *Guitierrez-Hermosillo*, 142 F.3d at 1230.

Here, the officers reasonably believed Ashley had actual authority to consent to the home

visit.  Officer Cleland and Officer Blas testified that when Ashley answered the door, she

appeared to be a "teenager."  Tr. at 26, 150.  Officer Cleland estimated her age to be 16 or 17

years old.  Tr. at 26.  He said she "seemed mature" and "looked to be in charge of the house at

that point."  Tr. at 30.  Officer Cleland further stated Ashley did not appear to be "somebody that

wasn't actually in charge or needed to have somebody watch over her or anything at that point."

Tr. at 30.  He said she appeared to have the "run of the house."  Tr. at 31.  Based upon these

15

observations, and the knowledge that Ashley's parents were at work, the officers' belief that Ashley had actual authority to consent to the home visit was reasonable. Therefore, the court also finds Ashley had apparent authority to consent to the home visit.

## C.     Reasonable Suspicion to Search

A probation officer may search a probationer's residence without a warrant if there is reasonable suspicion to believe that the probationer is engaged in criminal activity or a probation violation. *See Knights*, 534 U.S. at 121; *Crew*, 345 F.Supp.2d at 1268. "Reasonable suspicion is a less demanding standard than probable cause." *United States v. Tucker*, 305 F.3d 1193 (10th Cir. 2002) (citing *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002)). "While probable cause means 'a fair probability that contraband or evidence of a crime will be found,' reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity." *Tucker*, 305 F.3d at 1200 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quotation omitted)). To determine whether reasonable suspicion of criminal activity or a probation violation exists, the court considers the quantity and reliability of the information possessed by the probation officers and considers this information in light of the totality of the circumstances. *See United States v. Freeman*, 479 F.3d 743, 748-49 (10th Cir. 2007) (citing *Sokolow*, 490 U.S. at 8).

Here, Officer Cleland and Officer Blas did not have reasonable suspicion of criminal activity or a probation violation when they initially went to Defendant's home to conduct a home visit. Tr. at 17. The purpose of their visit was to conduct the first home visit and begin an investigation into whether Defendant was living beyond his means. Tr. at 14, 17. At the time Officer Cleland went to Defendant's home, he possessed the following information: 1)

Defendant had a prior drug trafficking conviction; 2) Defendant had a prior weapons charge; 3) Defendant had ties with the Los Padillas gang; 4) Defendant had recently moved into a large new house and purchased a new truck; and 5) Defendant may be living beyond his means.  Tr. at 16-18.

During the course of the home visit, Officer Cleland saw a red Philadelphia Phillies hat bearing the letter "P."  Tr. at 19-20.  The hat was located in Defendant's bedroom on top of his dresser.  Tr. at 19.  Officer Cleland, a trained officer with considerable experience working with the gang unit, Tr. at 11-12, immediately recognized the hat as indicative of gang attire worn by the Los Padillas gang.  Tr. at 20.  Officer Cleland knew Defendant was associated with the Los Padillas gang and believed Defendant's association with gang members was a violation of his probation.  Tr. at 20.  Therefore, Officer Cleland looked for other possible gang attire.  Tr. at 20. He walked towards Defendant's closet, which was open with Defendant's clothes visible.  Tr. at 20-21.  He saw a black shirt with a yellow Zia symbol on the front, also indicative of the Los Padillas gang.  Tr. at 21-22, 61.  The shirt said "9th Annual Boyz Party," which Officer Cleland testified was a large party sponsored by the Los Padillas gang.  Tr. at 21, 61.

Based upon his observation of the hat and shirt in plain view, Officer Cleland believed he had reasonable suspicion that Defendant was associating with the Los Padillas gang in violation of his conditions of probation.  Tr. at 34.  He then began to search for more gang attire.  Tr. at 22.  He looked in the laundry hamper located in Defendant's closet.  Tr. at 22.  He moved the clothes on top of the hamper and discovered a large clear plastic bag of money hidden below the clothes.  Tr. at 22-23.  The quantity of money alarmed Officer Cleland and caused him to believe Defendant was engaged in drug trafficking.  Tr. at 36.  At that point, he left the house and called

17

for back-up.  Tr. at 37.

The information Officer Cleland possessed before going to Defendant's home in addition to the discovery of possible gang attire is not sufficient to lead a reasonable person to believe Defendant was engaged in criminal activity.  *See Knights*, 534 U.S. at 121 (suspicion of criminal activity supports warrantless probation search).  Neither associating with gangs nor having gang attire is a crime.  *See United States v. Freeman*, 479 F.3d 743, 749 (10th Cir. 2007) (defendant's parolee status, criminal history and past association with gangs, without other particularized and objective facts, were not sufficient to form reasonable suspicion).  Therefore, the validity of Officer Cleland's search of the laundry hamper is dependent upon him having reasonable suspicion that Defendant was in violation of a condition of probation.  *See Crew*, 345 F.Supp.2d at 1268.

The Judgment, Sentence and Order Suspending Sentence ("Judgment") entered by the Second Judicial District Court for the State of New Mexico on June 9, 2005, in *State v. Sanchez*, No. CR 04-02923, is a standard form judgment in which Defendant's sentencing conditions are identified by checking the boxes associated with each condition imposed. *See* Mot., Ex. B.  The condition "Defendant Shall Not Have Contact or Association with Any Street Gangs or their members" was left unchecked, and therefore was not a condition imposed by the state court. *Id.* at 4.  In addition to the Judgment, the state court entered an Order of Probation imposing the following standard condition of probation:

> 4-ASSOCIATIONS: I will not associate with any person identified by my Probation/Parole Officer as being detrimental to my Probation supervision, which may include persons having a criminal record, other probations and parolees, and victims or witnesses of my crime or crimes.

Def. Ex. A.

18

Officer Cleland testified that the "Associations" condition includes a prohibition from associating with gang members because "probation considers gang members as a detriment to their probation and parole." Tr. at 20. He said "through [his] training and experience, you don't allow them, probationers and parolees, to associate with anybody that could possibly get them in trouble. That's what we call detrimental to their probation, including. . . convicted felons, gang members." Tr. at 32. He testified that the fact that the condition does not specifically say gang members does not change the fact that probationers are prohibited from associated with them. He further stated "it's been the practice, as long as I've been at probation and parole, they [probationers] have not been allowed to associate with gang members. . .". Tr. at 35; *see also* Tr. at 32. He said the fact that the Judgment did not include a prohibition against associating with gang members does not affect Defendant's supervision because the Order imposes a condition that "they will follow all instructions from probation and parole officers and there is also a condition that they don't associate with anyone that is detrimental to probation and parole." Tr. at 34-35. Officer Cleland also testified that probationers are prohibited from wearing gang attire because that too is a detriment to their probation and parole. Tr. at 20, 35.

The court agrees that associating with gang members is detrimental to a probationer's supervision. For that reason, it is understandably the practice of probation to prohibit probationers from associating with gang members. Therefore, Officer Cleland's assumption that Defendant was prohibited from associating with gang members was not unreasonable. However, in this case, the court finds Defendant's conditions of probation did not include a prohibition from associating with gang members or wearing gang attire.

Officer Cleland had no specific knowledge about Defendant's conditions of probation.

19

Tr. at 56, 58.  He had not reviewed Defendant's file or the Order of Probation before conducting

the home visit.  Tr. at 56, 58.  He knew Defendant had gang ties but did not know if Officer

Daniels had specifically instructed Defendant not to associate with gangs.  Tr. at 56, 59.  Officer

Daniels did not advise him that Defendant was not supposed to be associating with gangs or

anyone specific.  Tr. at 59.  Therefore, Officer Cleland acted upon his belief that Officer Daniels

had imposed this condition because it was the standard practice to do so.  *See* Tr. at 59.  He then

undertook a search of Defendant's laundry hamper, without consent, believing he had reasonable

suspicion that Defendant was associating with gangs in violation of a condition of probation.

However, Officer Daniels  admits she "never mentioned any specific individuals" to

Defendant that she considered detrimental.  Tr. 2 at 52.  She vaguely referenced a conversation

she allegedly had with Defendant in December about "gang contact" with "no specific names

ever mentioned."  Tr. 2 at 10.  She said she asked Defendant "if he ever had any gang affiliation

contact" and that "was the extent of [her] conversation."  Tr. 2 at 32.  There is no evidence or

indication that she ever instructed Defendant not to associate with gangs.  Furthermore, she did

not document her conversation with Defendant about his gang contacts or note any special

instructions or prohibitions in her file.  Tr. 2 at 10.

On the contrary, Officer Daniels took the position that Defendant should know what he

can and cannot do on probation without her telling him.  She explained:

> I go over the standard language of what it [the Order] says and don't mention
> individually people trafficking in drugs or gang members or people committing
> new offenses.  I don't really go into that.
>
> I mean, when you're supervising someone who just began probation, it's like they
> know what they've got probation for, and I think typically you would think that
> he would know that that would get him a new charge.

Tr. 2 at 52.  This dismal approach is consistent with her entire manner of supervising Defendant.

During the five months Officer Daniels supervised him, she failed to conduct a home visit or

obtain basic information about Defendant's past or how he was able to purchase a new home and

car on his $6.50 or $10.00 per hour salary.  Tr. 2 at 14-15, 18-19.  Instead, she considered

Defendant "outwardly compliant" because each month he brought her a paycheck stub, money

order and a stamp, and later told her he was moving.  Tr. 2 at 11, 16, 19.

      According to the Order of Probation it is incumbent upon Defendant's Probation Officer

to identify any person she considers detrimental to his probation.  Def. Ex. A, ¶ 4.  Only then is

he prohibited from associating with such person.  It is clear that Officer Daniels did not inform

Defendant she considered gangs detrimental to his probation or instruct him not to associate with

gangs or wear gang attire.  Therefore, the court finds Defendant was not prohibited from

associating with gangs or wearing gang attire, absent specific instruction from his probation

officer or the court.  Consequently, Officer Cleland's search of the laundry hamper was not

lawful because it was not based upon reasonable suspicion of an actual probation violation.  *See*

*Crew*, 345 F.Supp.2d at 1268; *see also Knights*, 534 U.S. at 120-22.

## D.    Inevitable Discovery

      When a defendant's Fourth Amendment rights are violated, the relevant question in

determining whether evidence is fruit of the poisonous tree and therefore subject to the

exclusionary rule is "whether, granting establishment of the primary illegality, the evidence to

which the instant objection is made has been come at by exploitation of that illegality or instead

by means sufficiently distinguishable to be purged of the primary taint."  *United States v.*

*Olivares-Rangel*, 458 F.3d 1104, 1120 (10th Cir. 2006) (citing *United States v. King*, 990 F.2d

1552, 1563 (10th Cir. 1993) (quotation omitted)).  "But for" causality is a necessary, but not a

sufficient, requirement for suppression.  *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th

Cir. 2006) (citing *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56

(2006)). The exclusionary rule does not apply if the government can show that the evidence

would have been inevitably discovered, was discovered through independent means, or was so

attenuated from the illegality as to dissipate the taint of the unlawful conduct.  *See Torres-*

*Castro*, 470 F.3d at 999 (citing *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir.

2000)).  "Under the inevitable discovery exception, unlawfully seized evidence is admissible if

there is no doubt that the police would have lawfully discovered the evidence later."  *United*

*States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982); *see Nix v. Williams*, 467 U.S. 431, 444, 104

S.Ct. 2501, 81 L.Ed.2d 377 (1984) (prosecution must establish by preponderance of the evidence

that the same evidence "inevitably would have been discovered by lawful means").

       In this case, the court finds Ashley gave lawful consent to the officers to conduct a home

visit.  The officers specifically stated they wanted to conduct a home visit or field call and asked

Ashley if she would "show them around" the house, which she did.  Tr. at 19, 71, 111, 131, 145.

Thus, the request and consent given was to conduct a home visit.  At no point did Ashley restrict

the scope of the home visit either verbally or implicitly.  There is no evidence to suggest she

would have withheld consent to look at any part of the premises, including the garage.  *See, e.g.,*

*Torres-Castro*, 470 F.3d at 1000 (where defendant was cooperative and gave consent to search

for weapons, court found no evidence to suggest defendant would have withheld consent).  "The

scope of a consent to search 'is generally defined by its expressed object, and is limited by the

breadth of the consent given.'"  *Pena*, 143 F.3d at 1368 (quotation omitted).  The court employs

an objectively reasonable standard to measure the scope of Ashley's consent, asking what the typical reasonable person would have understood to be the scope of her consent. *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.C.t 1801, 114 L.Ed.2d 297 (1991). Applying this standard, the court finds Ashley consented to the officers' home visit as described herein, which included generally looking around the entire house without restriction.

The officers' completion of the home visit was cut short by Officer Cleland's discovery of a large quantity of money in Defendant's laundry hamper pursuant to an unlawful search. However, the court finds that if Officer Cleland had not searched the hamper and discovered the money, he would have proceeded with the home visit. *See* Tr. at 40 (Officer Cleland testified once the other officers arrived, he "continued with the probation search" indicating his investigation was interrupted). The garage is an extension of the home and an obvious place for a probation officer to inspect during a home visit, especially when an officer is looking for evidence that a probationer may be living beyond his means. In this case, Officer Cleland received information that Defendant had recently purchased a new car, which indicated he may be living beyond his means. Therefore, this information would have undoubtedly led Officer Cleland to look in the garage as part of the home visit.

Upon entering the garage, Officer Cleland could immediately smell marijuana. Tr. at 53. He then walked into the garage and saw a bag laying open with a brick of marijuana in it and a small quantity of marijuana scattered on the floor of the garage. Tr. at 40; Gov. Ex. 3 (photo of marijuana in garage). The marijuana inevitably would have been discovered in plain view during the course of Officer Cleland's home visit. Upon discovery of the marijuana, Officer Cleland would have had probable cause, not merely reasonable suspicion, that Defendant was

engaged in criminal activity.  *See Knights, supra.*  Based upon this discovery, Officer Cleland

would then be authorized to conduct a warrantless search of the entire house.  *See id.*  A search

pursuant to the lawful discovery of the marijuana would have led to the inevitable discovery of

the money in Defendant's laundry hamper.  Therefore, the court finds that the exclusionary rule

is not applicable in this case because the marijuana would have been inevitably discovered by

lawful means, which then would support a search of the house leading to discovery of the

money.  *See Nix*, 467 U.S. at 444; *Torres-Castro*, 470 F.3d at 999.

      **IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence with

Supporting Authorities [Doc. 26] is **DENIED**.

      Dated this 17th day of February, 2009.

_____

MARTHA VAZQUEZ

UNITED STATES DISTRICT JUDGE